Apex Clearing Corporation Good morning, your honors. Mark Gigli for Appalie defended Apex. With me at counsel table is Cecil McLaughlin and Jack Pace. The plaintiffs challenge 120 years of established New York brokerage law. And let me just say, when you look at these cases, you have to parse them into sort of, I think, two buckets. One is general broker-deal-a-law, which is established and settled in New York state. And then second, the brokerage law that's grown up over the last 60, 80 years for clearing brokers. And I'll try to be clear on that as I go along. Can I ask you a question? Under the way that the district court decided this case, and under what I understand your interpretation of the laws to be, could your client, let's just say, every single day, pick a particular stock that it decided that it was in its best interest to stop trades on and just stop trades? And it could just do whatever it wanted to do every single day on that? Let me start with the contract, and then we'll go to the practical answer, the contract. The contract, which is three-way. Retail customers see the contract. I understand it could under the contract. The contract clearly gives us that right, both in paragraph three, and I think we underplayed paragraph four. We can refuse any trade. Right. But I guess what I'm asking you is, beyond the contract, I mean, what if every single broker-dealer decided that it was just going to figure out what trades were in its best interest on any given day and only accept those trades and not do any other trades? I mean, wouldn't that be a problem? I mean, for the larger part of the market? Sorry, Judge Rowe. That's all right. First of all, we only make money when there's trading. So the times when we stopped here, as here on this day, was when there was a huge spike in prices. Robinhood cut off trading for 12 or 13 stocks. We cut off three. So it's very rare. It happened one day, and we don't make money. Right, but theoretically, I mean, I know you all thought it was a short squeeze situation. It looked like it at the time. But I guess since that time, it's been determined that it wasn't actually. But, I mean, you know, you could find that there is a short squeeze situation on any given day, I guess, and decide that you weren't going to, that it was in your best interest. You didn't want to have to come up with a collateral, whatever. Let me start with this case, and then let me go to the more general sort of hypothetical you're suggesting. In this case, paragraph 119 says it was reasonable that Apex reasonably believed they had a collateral issue. That admission in paragraph 119, I think, contextualizes things. Except that it did. That's what it says. Except that it later says that they found that they didn't and continued to keep the bar in place, doesn't it? Well, the complaint also admits that it was still elevated because what was going on in the market was a huge gamma squeeze. So even though it was less than they thought at 9.30 in the morning where trading opened, it was still elevated, according to paragraph 79, and this is all at docket 483. On what are the restraints generally, let me start with what the regulators say. The regulators say we want you, as a matter of risk management, this is in the red brief at page 25, we want you in the contracts to have the safety valve of being able to say no, that we're not going to accept trades for this stock at this moment. So that's the SEC. The SEC has issued two reports, January 30th and the October 21 report. Both of them quote the language that brokers reserve the right to refuse trades, and they do that as a matter of risk management. The complaint says we're doing it for self-preservation. The reply brief says that the bad motive here is we were trying to protect ourselves. That's exactly what the regulators are talking about. And the admission found in note four is astonishing in the reply brief. With due respect for my friends, they simply say yes, it's completely established in New York law, and we heard it earlier in the earlier stand on the floor, that APEX can say no. Now we've only said no one day in our existence to three stocks for 210 minutes. Why is that? And this is a long-winded way of getting back to you, Judge Rosenbaum. We only make money when there's full trading in the thousands of stocks, and there are other clearing brokers, and some clearing brokers did keep trading. So we're hurt, and our introducing brokers are hurt. They're not making money. They only make money through commissions. So there is a huge incentive to keep those 100 customers happy. They were extremely unhappy if you take a look at paragraph 71 through 79 of the complaint. That's part of the record here, and they made it clear to my client that you had a black-eye day. So the quick answer or the short answer to my question is it would never happen that everybody would just decide, that every single broker-dealer would just decide that they were going to halt trading for their own benefit because it wouldn't be to their benefit in most situations. You would be driven out of the market, right? The free market controls that. I think at some point, and we had no sanctioning here by the SEC or by FINRA of APEX, but at some point just that market restriction that the marketplace wants to trade, and if you woke up every day and you were like, we don't like Microsoft today, you know, how could you possibly stay in business? The retail customers would go bananas. So that's why that's never happened in the history of APEX. It's not just that the retail customers would go bananas, but you wouldn't have any trades, and so you wouldn't make any money either. Well, actually, retail customers would go to another introducing broker, and we have that. But what I'm saying is you wouldn't, I mean, if you're, if the way that you're making money depends on having trades, you wouldn't have trades, you wouldn't make money. Am I missing something here? You're exactly right, especially with a popular stock like Microsoft. But for any stock, you have to be a reliable clearing broker, right? We're dealing with a world of T plus two clearing, right, where we're under tremendous risk once we accept the trade, and for the two days we carry the risk in the market of the price going up and down and the buyer backing out and not showing up with the money, and we're stuck holding the bag. That's the job. That's the role we play. We're the bridge between the introducing broker. Can I ask you a more fundamental question? And this goes to something that my colleagues have been poking around at. There seems to be some tension between what the New York state courts have said and what some of our federal brethren have said in the Southern District of New York and on the Second Circuit. Am I reading that right? Or can this all be read together neatly and tightly and the federal courts have not taken it upon themselves to add exceptions and to extend duties and to do things that the New York state courts have not themselves done? Well, let me just say, first of all, there aren't that many state cases. We think Bush is fundamental, but we also have the Schwartz case, and there's one other. Let me just— Cali or Cali? Yeah, and sorry, Your Honor. It's the other New York—Greenfield is the one I'm searching for. Those cases are clear. You know, to me, we're eerie. Hannah versus Plumer. Why would we even look at the New York cases? We sort of look at the New York cases, and I'm a New York lawyer, just because they're convenient, they're well-written, smart lawyers. You're talking about the federal cases? Yes, the SDNY and the Second Circuit. I think to kind of cut through some of the McDaniel cloud, let me just address McDaniel, because I do think some of the federal courts have muddied the water. I'm looking at McDaniel, Your Honor, at 196 F sub second at 352, and it says, quote, On the other hand, if you'll indulge me, where a clearing firm moves beyond performing mere ministerial or routine clearing functions and becomes actively and directly involved in the introducing broker's actions, it may expose itself to liability. With respect to the introducing broker's misdeeds, and in every case is a fraud case or some other kind of manipulation. In other words, with that saying there, it's really an aiding and abetting concept. In other words, if the introducing broker is engaged in misconduct and the clearing house aids and abets that misconduct actively beyond just the backdoor role, they're in it. Is that as I understand the federal case? That's very well said. And in addition, if you look at the facts of that case, McDaniel, which is an arbitration award case, McDaniel involves Bear Stearns going uptown to live and sit at the introducing broker's offices for six weeks. There's clearly nothing here that's like that. All we did was say, we are not doing these three meme stocks. If you look at the complaint, they act like somehow we reached into the introducing broker. But when we say we're not accepting those trades, there's nothing more that can be done except for the introducing broker to tell its customers immediately, write this during the trading day, don't accept those trades. You're going to be on the hook for them. Is the difference, I mean, you pointed out the fraud, misdeed part of it, and I think that's what the district court hung its, the district court in our case hung its hat on. But it seems to be something more fundamental that in those cases, trades were in fact accepted or there was part of a larger trading or there weren't non-discretionary accounts. In the context of, tell me if I'm wrong on this, in New York state law, not the federal district courts, in New York state law, has there ever been found a duty where the broker rejected the trade, said someone came to their window and said, I'd like to buy this stock, and the broker says, not today, folks. No, and if I could, Your Honor, we did additional research after we got the reply brief. I want to just supply two authorities of just pure New York state law, if I may, Amaranth versus JPMorgan Chase. This is 71 AD 3rd 40, and the relevant passage is at 46, and that's in 2009. That's the first department, which is New York City, Manhattan. The second case I would direct the court to is Omnivest versus Elders Futures, also the first department, 157 AD 2nd 528 at 30, and that's 1990. I would just say counsel in the future for that kind of thing, please file a supplemental authority letter. It's the collegial thing to do both for us and for opposing counsel. We will, and I apologize to the court. I want to circle back to the muddle that some of the case law has. My colleague read a quote that said, you have a duty when you accept a trade. We don't challenge that. They point to paragraph one of the customer agreement and say it incorporates FINRA and SEC. That's for transactions. If we accept the trade, we're on the hook. We've got to execute that trade faithfully, reasonably. We can't give you NVIDIA and you are looking for Microsoft. We have to fulfill that in a reasonable way. We're on the hook, but the only safety valve is we can say no. We can say no under Bush. Bush cites those two older cases, the New York Court of Appeals case, La Marchande, and the Supreme Court case of Gallagher, and I think the behavior here perfectly matches Gallagher. Gallagher is the interesting case where the order comes in by telegraphy and the response by the broker, it was an introducing broker, goes out by U.S. mail, and the court said, wait a minute. This is the Supreme Court before Erie, so it's federal common law, but it's incorporated into New York state law through those cases. The ruling is you've got to be prompt in telling people, and we were absolutely prompt in telling the introducing brokers what we were doing. There's no question, though, that those intermediate courts, in this court, the 11th Circuit, that those give us the guide to New York law. You have the Fox case versus Ritz-Carlton as one of those many examples where this court has said, I'm going to look and see what the rule, the substantive rule of decision should be under Erie, and it's clearly supplied by New York state cases. The federal cases, I think, actually are consistent with this. The two-part test we were talking about earlier with McDaniel, Your Honor, we've talked a little bit about the second prong, and that's where the district court, the MDL court, went. The first prong, I think I have a little bit of a quibble with the MDL court. The first prong really comes down to, are you behaving like a clearing broker? And frankly, I think sticking to paragraph 3 and paragraph 4 of the customer agreement, when we say no, and the SEC has said you need to have that as a risk management, safety valve, that saying no was part of being a clearing broker. Aren't the allegations, though, that your client told the introducing brokers they were not to accept any more trades with regard to the, any more buy orders with regard to these stocks? Right, and that's where I'm saying they then try to go to the cases where the Bear Stearns, there's like three Bear Stearns cases involving this character Baron, and there's an SEC enforcement action that gets into all of the six weeks that Bear Stearns stayed there. But the key point is, if you go to the complaint and you read what the complaint alleges, and this is the fourth complaint, right, they had 20,000 documents because we had all kinds of investigations. The complaint says in paragraph 71 on Webull, and I'm over my time so I'll be quick, it says on Webull... You're not actually, you've still got a minute 30 left. Oh, okay, I'm on yellow. So paragraph 71 says, we were told by Apex we need to stop, you know, accepting buy orders for these meme stocks. And I'm like, that's pretty articulate, right? When your clearing broker says your trades are not going to go through T plus 2 settlement through the NSCC and the DTC, you're out of business for trying to help customers buy those three stocks. And, of course, that makes the introducing brokers furious. But it's not not being a clearing broker. It's not becoming an introducing broker, giving advice, saying NVIDIA is a good stock. That's what introducing brokers do. We disclaim all of that in paragraph 6. We don't care what stock you hold. We don't care whether the stock goes up or down. Why is that? Because some of our introducing brokers are saying buy Microsoft. At the same time, some of them are saying sell Microsoft. So we can't have a view on Microsoft or any of these stocks. What happened here was we thought that there was a real problem, a billion-dollar problem, according to the record. I will say, I want to go back to that, because if you look at paragraph 71, and I think that's the right area in the amended complaint, again, the allegation is that your client informed the introducing broker that they needed to shut off the ability to do something. That's different than just we are either going to clear your trade or not clear your trade consistent with guidelines. You need to shut off this function so that there can be no more buy orders there. That seems to go out of the backdoor role and more into the front door. First of all, I have the right to say no under paragraph 3 and 4. We're not talking about that, though. Right. So to implement that during the trading day, you should be unambiguous that if you accept these trades, they're not going to be cleared through us, and there's no evidence in the record that any of the introducing brokers had other clearing arrangements. So it's tantamount, and it's the courteous thing to do to say, don't accept these three stocks while we're in this status. So we don't think there's any other way to behave, and it's not the same thing as coming down off your pedestal, no longer being a clearing broker and becoming an introducing broker and talking about why this stock is a good stock or whatever. Just so I understand, to sort of like, in my mind, sort of bring this full circle, you're still, I think, in your discussion here on your quibble with the first part of the district court, the MDL court's analysis. You would say, even if everything you just said for the last five minutes is wrong, you would still say that unless you're actively engaged in the misconduct, you're not on the hook. You don't have the duty. Clearly, the MDL court got it correct on the second prong. On the first prong, I reread that paragraph several times. I get guidance, Your Honor, from the Levitt opinion, and I'm looking at page 465, 710 of 3rd at 465, and the way the Levitt court, this is in 2013, so McDaniels, 2002, it goes through and synthesizes pretty well the law, and it says there, applying these principles, district court and the circuit have distinguished two categories of cases. First, in cases where a clearing broker was simply providing normal clearing services, district courts have declined to impose liability on the clearing broker for the transgressions of the introducing broker, and my point is saying no is fundamentally part of being a clearing broker, and we clearly win on the second prong, but that's our quibble. All right. Thank you very much, Mr. Safferstein. You have three minutes. Thank you. I want to point out that in addition to the cases that I cited before, I think the Global Enterprise Group Holdings case is important as well because there, the Southern District of New York Court held that fiduciary duties may exist where a clearing broker asserts control over the introducing broker's business, or it becomes actively and directly involved in an introductory broker's actions. That is clearly what happened here, and you have a finding of fact by the MDL court that this activity that was done was beyond simply the ministerial functions, that they took over and took over control over the actions of the introductory broker. So then the question becomes, are there any consequences for this? Does the court really believe that there are no limits as to what a financial institution such as a clearing broker can do to its customers? That's the parade of horribles. Well, Judge Rosenbaum, going back to the question that you presented to my friend, we're talking about three meme stocks. Let's say Apex decided tomorrow that they're shutting down for hours the ability of people to purchase Apple. Is that okay? Or Tesla? Why would they do that based on the representations from Mr. Gidley? They lose money when they don't sell, when they don't. Well, I would turn the question right back to him. And the question is, if they knew that there was no collateral increase at 12 o'clock, it was based upon his representation and his brief to the court, and the MDL court found that as of noon there was no reason to have this halt. And they didn't do anything, and they didn't lift it until 255. But I'm still asking you, though, what is the incentive? There may well be one. What is the incentive, but I don't know what it is? Well, assuming that you don't know what it is, which you don't, is the court going to say that that's okay? And if the court says it's okay, then what you are saying is that any broker-dealer or any clearing broker-dealer at any time, which has a standard agreement, they all have standard agreements that say they don't have to accept stocks. It's more than that I don't know what it is. It's that there's no indication that there was something nefarious or fraudulent or underhanded going on, and you haven't explained to me. And this is just a practical. I'm not talking about the law here. I'm trying to figure out the big picture. So from a practical standpoint, what is the incentive for broker-dealers to act in this way if we don't agree with your position? I don't think broker-dealers, as I think, this is a horrible situation. I don't think broker-dealers ever have the justification to do this or that it's ever okay, which is why they're interested. I'm not asking about justification. I'm asking about incentive. I don't believe that they had a proper incentive. If they knew that the collateral wasn't going to be increased, first of all, they should have asked in the first place. Once they find out by noon that there isn't going to be a collateral increase, what is the business reason for keeping such a draconian act in place? They're introducing brokers. You're saying it doesn't benefit them in any way. There's no record evidence that it does. The inference, and we are on a motion to dismiss, the inference is that if they have the specific information, which the district court found at noon, that there isn't a business reason to have this draconian one-way market suspension and they keep the market suspension until 255, so it's three hours, then there's nothing for you to consider that there was any rational or reasonable reason for them to do it. The only thing that you do know for a fact is that the investors lost money. And the question that I would put to this court as well as to the lower, to the MDL court is, are there no consequences? Can a broker-dealer, can a clearing broker-dealer shut down the system purposefully to drive down the price of the stock and say, we have no liability? The FINRA rules make it very clear that implicit in all customer agreements, there is a duty of care. What the district court did is throw that out. I am begging you to please do not throw out years and years of regulations and years and years of jurisprudence protecting investors to allow broker-dealers or clearing broker-dealers to act in a way that purposefully harms investors and has no demonstrable benefit to clearing broker-dealers. All right. Thank you very much, Mr. Saperstein. Thank you both. We'll be in recess.